IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL WIDMER       )<br>       Plaintiff,  )<br>       )<br>vs.       )<br>       )<br>MARCUS HODGE, and  )<br>LINGLE,       )<br>       )<br>       )<br>       Defendants.  )<br>       ) | CIVIL No. 13-cv-0025-SCW |

## MEMORANDUM AND ORDER

**WILLIAMS, Magistrate Judge:**

### Introduction and Procedural Background

Plaintiff Michael Widmer, currently released on parole, filed this case in December 2012 alleging a plethora of injuries due to unconstitutional conduct at Lawrence Correctional Center. (Doc. 1). At screening, the Court determined that Plaintiff had stated a claim for unconstitutional conditions of confinement based on his allegations that he was not provided a diet sufficient to prevent weight loss and symptoms of malnutrition. (Doc. 1, p. 4). However, the Court also determined that this claim was not related to Plaintiff's other counts and severed this claim into a new action on January 8, 2013. (Doc. 1). The case comes before the Court on Defendants' Motion for Summary Judgment. (Doc. 54).

Defendants filed the present motion on November 19, 2014. (Doc. 54). After seeking an extension of time, Plaintiff filed Response on January 21, 2015. (Doc. 60). At that time, Plaintiff also moved for an oral hearing on the motion. (Doc. 61). Because the Court has determined that no hearing is necessary, Plaintiff's Motion is **DENIED**. (Doc. 61). No reply was filed, making this

1

Motion ripe for disposition. For the following reasons, the Court **GRANTS** the motion for summary judgment.

**FACTUAL BACKGROUND**

IDOC housed Plaintiff at Lawrence Correctional Center ("Lawrence") from June 2012 until June 2013. (Doc. 57-1, p. 5). During that time, Plaintiff went on a writ to Stateville Correctional Center from July 25, 2012 until September 12, 2012. (Doc. 57-1, p. 6). While on the writ at Stateville, Plaintiff went on a hunger strike that lasted 10-11 days. (Doc. 57-1, p. 25). Plaintiff believes that he lost approximately 25 to 30 pounds as a result of this hunger strike. (Doc. 57-1, p. 26). His hair fell out as a result of the hunger strike. (Doc. 57-1, p. 26-27). Plaintiff testified that he felt better after coming off his hunger strike approximately two weeks after returning to Lawrence. (Doc. 57-1, p. 26). Plaintiff resided in the segregation unit of Lawrence during the relevant time periods. (Doc. 57-1, p. 6).

Plaintiff sued Marc Hodge, the warden of Lawrence, because he informed him many times that his meal portions were inadequate. (Doc. 57-1, p. 7). Plaintiff specifically told Hodge that he had compared the portions of his breakfast tray with the portions specified on the IDOC master menu and found them lacking. (Doc. 57-1, p. 8). Hodge recalls speaking to Plaintiff on two occasions, but does not believe that either of those occasions addressed Plaintiff's dietary complaints. (Doc. 57-3, p. 15). The longest conversation Hodge had with Plaintiff addressed discipline Plaintiff received after attempting to contact someone on his no-contact list. (Doc. 57-3, p. 14-15). Plaintiff also sued Brian Lingle as the dietary supervisor at Lawrence. (Doc. 57-1, p. 14-15). Plaintiff alleges that Lingle oversaw preparation of the breakfast trays. (Doc. 57-1, p. 15).

Plaintiff alleges that the breakfast trays had inadequate volume during the relevant time period. (Doc. 57-1, p. 16). He found the lunch and dinner trays close enough to the IDOC master menu to warrant no complaints. (Doc. 57-1, p. 16). Plaintiff determined whether his trays were

adequate or not by taking his milk carton or spoon and measuring the portions served, writing down these measurements, and then comparing the measurements to the IDOC master menu. (Doc. 57-1, p. 16). Plaintiff's milk carton is approximately 8 ounces. (Doc. 57-1, p. 17). He would use the provided spoon to scope portions into his milk carton to determine how many ounces each portion had. (Doc. 57-1, p. 17). Plaintiff drew lines on his milk carton to approximate 2, 4, and 6 ounce levels. (Doc. 57-1, p. 18). He drew these lines measuring from the top of the carton. (Doc. 57-1, p. 18). If the portion was measured in teaspoons, he would request a teaspoon, although he believes the plastic teaspoons may be smaller than an actual teaspoon. (Doc. 57-1, p. 17).

Plaintiff also testified that he wrote to the manufacturer of the trays and found out the portion sizes of the Styrofoam trays. (Doc. 57-1, p. 29-30). He could then determine, from looking at the sections and checking to see that they were full, if the portions on the tray were adequate. (Doc. 57-1, p. 29-30).

Plaintiff testified that on some days, he received approximately one teaspoon of scrambled eggs for his breakfast. (Doc. 57-1, p. 17). He testified that if the master menu called for three pancakes, he would only receive two. (Doc. 57-1, p. 19). He never received three pancakes. (Doc. 57-1, p. 19). If the master menu called for four ounces of oatmeal, Plaintiff would receive an ounce. (Doc. 57-1, p. 19). Plaintiff alleges that the portions of cereal, oatmeal, rice, cracked wheat, and scrambled eggs were consistently off. (Doc. 57-1, p. 20). Plaintiff believes that approximately 1 tray a week had the correct portions. (Doc. 57-1. p. 18). If the menu called for hard boiled eggs, he would get the correct number of eggs. (Doc. 57-1, p. 20). Plaintiff also testified that he became angry enough to file a federal lawsuit not because he was hungry and required large portions, but because the portions were so clearly inadequate. (Doc. 57-1, p. 18). Plaintiff complained of hair loss in his Complaint; he attributes the hair loss to the stress of having a negative emotional reaction to seeing an inadequate tray. (Doc. 57-1, p. 23).

Plaintiff testified that in December 2012, he went on a kosher diet. He further testified that at that time, Lingle approached him and told him that his kosher breakfast trays would have the right portions. (Doc. 57-1, p. 33). Plaintiff testified that he did not have any problems with his kosher breakfast trays. (Doc. 57-1, p. 33). Lingle has no recollection of Plaintiff or any occasion where he spoke with Plaintiff. (Doc. 57-2, p. 13).

Lingle has been a food service supervisor for 10 years. (Doc. 57-2, p. 3). He monitors food preparation, service, and sanitation. (Doc. 57-2, p. 3). Inmates prepare the food. (Doc. 57-2, p. 3). Lingle testified that until four years ago, two supervisors worked the breakfast shift. (Doc. 57-2, p. 4). However, a supervisor named Rich Gordon felt that requirement interfered with his ability to take time off, and so management changed the requirement to 1 supervisor on breakfast shift. (Doc. 57-2, p. 4).

Lingle works the overnight shift, which prepares and serves the breakfast meal, makes desserts for lunch and dinner, and starts lunch preparation. (Doc. 57-2, p. 4). The state dietician determines that the meals served are nutritionally adequate; Lingle follows her master menu. (Doc. 57-2, p. 4). He receives copy of the upcoming week's master menu on Saturday. (Doc. 57-2, p. 7). Rick Densmore, the supervisor, orders supplies for the kitchen area, including the food. (Doc. 57-2. p. 7). As part of his job, Lingle prepares a sample tray for the inmate workers to demonstrate portion size. (Doc. 57-2, p. 17). If there is not enough food to fulfill a certain portion, Lingle may make substitutions. (Doc. 57-2, p. 7). He testified he needs to make substitutions due to shortages perhaps once to twice a year. (Doc. 57-2, p. 7). If he makes a substitution, he fills out a report. (Doc. 57-2, p. 7).

Lingle's responsibilities during his shift include monitoring the serving line where the inmate workers make trays to ensure that all trays are the same and that the workers follow the master menu. (Doc. 57-2, p. 8). If he sees a tray with inadequate portions, he would pull it off the line and

4

make it right. (Doc. 57-2, p. 17). The workers control portion size by using the correct utensil. (Doc. 57-2. p. 8). Lingle testified that the food unit is especially careful to make sure the segregation trays are correct. (Doc. 57-2, p. 18).

Lingle testified that although he is allowed to make substitutions, he once got disciplined for substituting eggs for sausage because management determined that meat was available. (Doc. 57-2, p. 9). The prison also disciplined Lingle for allegedly failing to start chicken for the lunch shift and for losing a pair of tongs. (Doc. 57-2. p. 9-10). Lingle regularly receives complaints from inmates about portion size being too small. (Doc. 57-2. p. 10). Lingle testifies that the breakfast tray is a full tray. (Doc. 57-2, p. 11). He also testified that he personally did not have the authority to give inmates food beyond what the master menu required. (Doc. 57-2. p. 11).

Hodge does not recall any incident during his time as Warden when the prison was not providing or feeding the inmates what the master menu required. (Doc. 57-3, p. 16). He also does not believe that failure to meet the master menu was a common inmate complaint. (Doc. 57-3, p. 16). If it had been a common complaint, Hodge would have spoken to Rick Densmore, the dietary supervisor. (Doc. 57-3, p. 16). Hodge attempted to walk the housing units daily and walk through segregation every other day in order to talk to inmates about their perceptions of the facility. (Doc. 57-3, p. 16).

Plaintiff used copies of the 2012 master menu as exhibits to certain depositions. (Doc. 57-3, p. 57-61). The breakfast menu consistently alternates between 2 cups of cold cereal or 1 cup of hot cereal every day. (Doc. 57-3, p. 57-61). Scrambled eggs are on the menu approximately once a week; the portion size is ½ cup. (Doc. 57-3, p. 57-61). Pancakes appear approximately once a week; the serving size is 3. (Doc. 57-3, p. 57-61). Two slices of wheat bread were served three times a week. (Doc. 57-3, p. 57-61). The master menu also required one serving of a "breakfast pastry" on Saturdays. (Doc. 57-3, p. 57-61). On Sundays, one biscuit was served with ¾ cup gravy. (Doc. 57-

5

3, p. 57-61). Two hard boiled eggs were served once a week. (Doc. 57-3, p. 57-61). One 4 ounce portion of breakfast meat was served once a week. (Doc. 57-3, p. 57-61). Two waffles were served once a week. (Doc. 57-3, p. 57-61).

### LEGAL STANDARDS

1. **Summary Judgment**

Summary judgment is proper only if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. **Dynegy Mktg. & Trade v. Multiut Corp., 648 F.3d 506, 517 (7th Cir. 2011) (citing Fed. R. Civ. P. 56(a)).** The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits and/or information obtained via discovery—the lack of any genuine issue of material fact. **Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).** In determining whether a genuine issue of material fact exists, the Court must view the record in a light most favorable to the nonmoving party. **Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).**

At summary judgment, the Court's role is not to evaluate the weight of the evidence, to judge witness credibility, or to determine the truth of the matter, but rather to determine whether a genuine issue of triable fact exists. **Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co., 528 F.3d 508, 512 (7th Cir. 2008)**.

2. **Malnutrition Claim Pursuant to the Eighth Amendment**

The Eighth Amendment requires that prisons provide inmates with the basic necessities of life, including shelter, clothing, medical care, and food. **Farmer v. Brennan, 511 U.S. 825, 832 (1994)**. This does not mean that inmates can demand the diet of their choice. **Carroll v. DeTella, 255 F.3d 470, 472 (7th Cir. 2001); Lunsford v. Bennett, 17 F.3d 1574, 1579 (7th Cir. 1994)**. Isolated incidents of missed meals will also not offend the constitution. **Reed v. McBride, 178**

**F.3d 849, 853 (7th Cir. 1999)**. But an extended period where a prisoner receives inadequate nutrition is an Eighth Amendment violation. **Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th Cir. 1996); see also Hutto v. Finney, 437 U.S. 678 (1978) (diet consisting of fewer than 1,000 calories each day could violate the Eighth Amendment if maintained for substantial time period)**. Like other conditions of confinement cases, the relevant inquiry is whether the defendants were deliberately indifferent to a substantial risk of serious harm to the inmate's health or safety. **Reed, 178 F.3d at 853-54**. Deprivations of 3 to 5 days may create a substantial risk of serious harm. **Id.**

In order to succeed on the second subjective prong, a plaintiff must show that the defendants knew of and deliberately disregarded the risk to his health and safety. **Dunigan ex. rel. Nyman v. Winnebago County, 165 F.3d 587, 591 (7th Cir. 1999)**. It is not sufficient for the official merely to be aware of the relevant facts; he must also draw the inference that serious harm may result from those facts. **Id.** The standard is "inaction or woefully inadequate action." **Hudson v. McHugh, 148 F.3d 859, 863 (7th Cir. 1998)**.

## ANALYSIS

Plaintiff has not carried his burden on showing that he was at a substantial risk of serious harm. Plaintiff's evidence consists of his own testimony that when he measured the portions of his breakfast trays using a makeshift milk carton, he determined that the portions did not match the master menu. The milk carton is not in evidence, and the Court finds that this method of measuring too vague. A typical milk carton is folded into a triangle shape near the top to create a spout for poring. If the carton states that it holds eight ounces,[1] the triangle portion is not included in that measurement. Unfolding this triangle will create a larger carton. It is not clear from Plaintiff's testimony whether in conducting his measurements, he measured from the top of a folded or

---

[1] The record is also unclear on whether the milk carton held eight ounces by weight or eight fluid ounces.

unfolded carton. Additionally, Plaintiff's testimony states that he used the milk carton to estimate portions in ounces. Yet, according to the master menu exhibits, the portions Plaintiff complains were short, namely cereal, oatmeal, rice, cracked wheat, and scrambled eggs, were all served in cup or half cup portions.[2] Plaintiff also testified that the trays themselves can serve as measuring units because their partitions are standardized, but he never testified that the partitions on the breakfast trays were not full. Rather Plaintiff relies on his make-shift milk carton measurement system to establish shortages. Plaintiff also testified that he took notes on these measurements, but his notes are not in evidence. He has not submitted any evidence of how many calories he was deprived or of what percentage of his daily allowance he received. The Court finds that no reasonable jury could accept this evidence as proof that the shortages Plaintiff complains of put him at substantial risk of serious harm.

Plaintiff's other evidence is also insufficient to show that he was at risk of serious harm. Plaintiff's complaint alleges that he suffered hair loss, stomach cramps, and signs of malnutrition. But Plaintiff concedes that those symptoms were actually the result of a 10 -11 day hunger strike he undertook at Stateville, which he estimates caused him to lose 25 to 30 pounds. Plaintiff concedes that he has no evidence of weight loss as a result of the alleged breakfast tray shortages. He has no medical records documenting his alleged symptoms. He also attributes his hair loss to stress, not malnutrition. Although Plaintiff alleges that the problem was systematic in his deposition, he presents no affidavits from other prisoners attesting to the same facts. In fact, contrary to what he pled in his Complaint, Plaintiff testified that he did not bring this case because he was hungry, but rather because he was angry. On this record, no jury could reasonably conclude that he suffered a substantial risk of serious harm from the alleged deprivations.

---

[2] In the American system of measurement, a cup is 8 fluid ounces. However, whether a cup is eight ounces by weight depends on the density of the substance measured. A cup of water weighs 8 ounces. A cup of honey weights 12 ounces.

The deprivations that Plaintiff complains of also fail to rise to a serious need as a matter of law. Plaintiff concedes that he received some food on his breakfast tray and that his lunch and dinner portions were always adequate. This is a far cry from cases where plaintiff suffered complete deprivations of food lasting several days. The deprivation suffered by Plaintiff was at most, minor, and by his own testimony, it only caused him emotional stress. Therefore, as a matter of law, the alleged shortages suffered by Plaintiff do not create a substantial risk of serious harm.

Having found that Plaintiff has not met his burden on the first prong of the test, the Court will not go on to consider Defendants' subjective knowledge. For the reasons stated above, the Court **GRANTS** the Motion for Summary Judgment. (Doc. 54).

## CONCLUSION

Plaintiff's Motion for Hearing is **DENIED**. (Doc. 61). Defendants' Motion for Summary Judgment is **GRANTED**. (Doc. 54). The Clerk of the Court is directed to close the case and enter judgment in favor of the defendants.

**IT IS SO ORDERED**.

**DATED: April 24, 2015**  /s/ *Stephen C. Williams*
**Stephen C. Williams**
United States Magistrate Judge